UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SUSAN K. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-10757-LTS |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| AS TRUSTEE FOR OPTION ONE | ) | |
| MORTGAGE LOAN TRUST, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

June 15, 2015

SOROKIN, J.

Plaintiff Susan Young brought this suit against the trustee of the trust that holds the

mortgage to her home, Defendant Wells Fargo Bank, and the servicer of the mortgage,

Homeward Residential.[1]  Before the Court is Defendants' Motion for Summary Judgment on all

of Plaintiffs' remaining claims.  Doc. No. 89.  Plaintiff has opposed the Motion, Doc. No. 95,

and the Court heard the parties on the Motion on April 27, 2015.  For the reasons that follow,

Defendants' Motion for Summary Judgment is ALLOWED.

I.      FACTS

As the background to this litigation have been set forth extensively by the First Circuit in

its opinion, Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229-31 (1st Cir. 2013), the Court

only recites those undisputed facts relevant to the pending Motion for Summary Judgment and

---

[1] Homeward Residential, Inc. was formerly known as American Home Mortgage Servicing, Inc.  Doc. No. 90 at 1.

reserves certain facts for the discussion of particular claims to which they are relevant. In

October 2009, the parties entered into a Trial Payment Plan agreement ("TPP") pursuant to the

Home Affordable Modification Plan ("HAMP"), which provided, in relevant part, that Plaintiff

make three trial period payments "On or before" November 1st, December 1st, and January 1st

of 2009 and 2010, respectively. Doc. No. 91-1 at 36. The document made clear the significance

of this plain language: "TIME IS OF THE ESSENCE under this Plan. This means I must make

all payments on or before the days that they are due." Id. (emphasis in the original).

The undisputed facts establish that Plaintiff mailed her second payment November 30th,

and that the payment was received by Defendants on December 2nd. Doc. No. 95-1 ¶ 72.

Similarly, she mailed her third payment on December 30th, and that payment was received by

Defendants on January 2nd. Doc. No. 95-1 ¶ 73. Plaintiff's payments were, unquestionably, late

and thus not timely. Indeed, on January 13, 2010, Homeward wrote to Plaintiff informing her

that her payments were untimely. Doc. No. 95-1 ¶ 74. On February 17, 2010, Plaintiff's

representative, Jerry DeSalvatore, spoke with "Diane" at Homeward who informed the

representative that the January 13th letter was sent by mistake. Doc. Nos. 95 at 3, 95-1 ¶ 77. On

March 10, 2010, DeSalvatore spoke to employees at Homeward who told him that the permanent

modification agreement was being drafted by a third party and was taking "longer than it

should." Doc. No. 95-2 ¶ 86. On June 14, 2010, Homeward sent Young a traditional, rather than

a HAMP, loan modification offer. Id. ¶¶ 87-88.

II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.    DISCUSSION

A.    **Breach of Contract**

Defendants contend that Plaintiff breached the TPP by not making timely payments thereby precluding her from proceeding with her claim for breach of the TPP.  The question is whether Plaintiff's late payments constitute a material breach of the agreement such that further performance by Defendants was excused.  Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006).  Plaintiff says no, pointing out that Defendants often did not cash the checks Plaintiff submitted until fourteen days after receipt.  Doc. No. 95 at 6 (citing Doc. No. 95-1 ¶¶ 10-11).  Plaintiff emphasizes that Homeward received the payments the day after the due date, one of the due dates was a federal holiday, and no specific provision of the TPP establishes the materiality of the brief delay, as a matter of law.  These are not, however, the only relevant

materiality considerations, for this was not merely a contract between Plaintiff and Defendants, it was a contract during which Defendants would consider Plaintiff for a HAMP loan modification. Thus, there is an additional and decisive consideration.

The TPP rendered Plaintiff eligible for consideration for a <u>HAMP</u> modification of her loan. The rejection letter Homeward issued stated only that she was ineligible for a HAMP modification due to the timing of her payments. Doc. No. 91-21 at 2, 4. The only evidence regarding the HAMP program or guidelines governing the modification Defendants were then considering for Plaintiff's mortgage comes from Crystal Kearse, a Rule 30(b)(6) deponent for Defendants. She testified as follows regarding the TPP's timing requirements: "You have to comply strictly with the trial payment plan in order to be entered into a formal or loan modification under HAMP." Doc. No. 91-10 119:9-12. She explained the reasoning behind this requirement: HAMP is "very strict. It's due to government guidelines, so there is little to no wiggle room with regard to payments being received and things of that sort." Doc. No. 91-10 119:6-9. Finally, Kearse testified that untimely payments preclude further consideration of a HAMP modification:

> Q: But in the event that a borrower fails to make timely payment, can they get back into HAMP?
>
> A: No, and we have no control over that. We are not able to put a person back into HAMP. Generally, if a borrower is kicked out of a HAMP program due to failure of making the trial payment plan, we can try to work them up on a traditional loan modification agreement.

Doc. No. 91-10 119:13-20.

In light of the foregoing, the Court finds that, as a matter of law, Plaintiff's late payments, albeit late by only one day, constitute a material breach of the TPP insofar as HAMP program requirements mandated strict compliance with payment receipt deadlines. Such a material

breach on Plaintiff's part excuses Defendants from further performance, i.e. further consideration

of Plaintiff for a HAMP modification, and renders Defendants not liable to Plaintiff for damages

arising from that nonperformance of that obligation. See Teragram Corp., 444 F.3d at 11.

Plaintiff objects to the foregoing analysis in several ways.

First, Plaintiff complains that Kearse lacked sufficient training in HAMP. Whatever the

depth of Kearse's knowledge of HAMP, her testimony makes clear that she is familiar with

HAMP and its requirements. See Doc. No. 91-10 118:25-119:20. More importantly, Plaintiff

offers no evidence that HAMP operates differently than Kearse explained. Second, Plaintiff

complains that no employee made the decision that Plaintiff was ineligible for a HAMP

modification. Rather, the decision was made by a computer. Doc. No. 95 at 4. Plaintiff,

however, points to nothing that prevents Homeward from automating that aspect of the

calculation especially in light of Kearse's testimony that the requirements were strict. Finally,

Plaintiff points out, correctly, that on February 17, 2010, her representative spoke with "Diane"

at Homeward who informed the representative that the January 13th letter stating that Plaintiff

was ineligible for a HAMP modification was sent by mistake. Doc. Nos. 95 at 3, 95-1 ¶ 77. Her

representative sent a confirmatory letter on February 17, 2010, repeating "Diane's" claim, Doc.

No. 95-1 ¶ 78, and Homeward documents confirm that someone memorialized making this

statement regarding the letter, Doc. No. 91-23 at 2-3. These statements by Homeward's

employee provide no explanation for the basis for the belief that the letter was sent in error. In

the face of Kearse's testimony that HAMP guidelines from the government are strict, and with

no contrary evidence as to that specific point, the statement that the letter was sent in error fails

to create a genuine issue of material fact. This is so especially when the more general

representation, that Defendants were considering (and did consider) Plaintiff for a non-HAMP

loan modification is undisputed; indeed Defendants offered Young a non-HAMP modification in June. Accordingly, Defendant's Motion for Summary Judgment is ALLOWED as to the breach of contract claim, Count I of the Complaint.

This claim, Count I, also fails for a second independent reason. The First Circuit determined that the only contract claim pled by the Complaint arose from Defendants' failure "to provide a permanent modification agreement by the modification effective date [of February 1, 2010]." See Young, 717 F.3d at 235. In moving for summary judgment, Defendant has established that Plaintiff has no evidence of damages on this breach of contract claim. In fact, the First Circuit, in its opinion, presaged this outcome, noting that "[o]f course, a breach of contract claim requires proof of damages, and Young's complaint leaves some uncertainty about the nature of the damages she seeks[,]" and that damages will "be important at later stages of the case." Id. at 236 n.8.

The undisputed evidence establishes that Defendants offered Plaintiff a permanent modification on June 14, 2010. Doc. No. 95-2 at ¶ 87. Plaintiff offers no evidence whatsoever regarding the terms of the HAMP modification to which she was entitled under the TPP. She has not provided the Court with an expert analysis of the HAMP guidelines applied to the financial information she had submitted to Defendants, nor has she otherwise pointed to rules or guidelines defining the type of modification to which she was entitled under HAMP. In the absence of any such evidence, she cannot establish that the permanent modification offered by Defendants differed in any material way from the HAMP modification to which she claims entitlement. Notably, the offered modification was a permanent modification, it provided for an initial interest rate of 4.625 percent climbing ultimately to five percent (the rate Plaintiff had requested, Doc. Nos. 91-4 at 111:7-18, 91-16 at 6), and it offered a monthly payment rate lower

6

than she had owed prior to the TPP.  Compare Doc. No. 91-1 at 32 (showing Plaintiff to be

behind four payments of $2,456.08 in September 2008) with Doc. No. 91-1 at 46 (setting

monthly payment of modification offer at $1658.71 initially, rising to $1718.93 after thirty-six

payments).  Plaintiff has identified no other mortgage-related delay damages—Defendants

waived all late fees for the period between February and June.  See Doc. No. 91-1 at 50

(schedule of offered modification showing no amount due for "Other Accrued and Unpaid

Fees")

The offered modification did increase the monthly payment from the amount due under

the TPP.  The monthly payment under the modification offered was $1658.71 per month,

approximately three hundred dollars more than the $1368.94 trial period payments, Doc. No. 91-

1 at 36.  But, the First Circuit has already ruled that "Young has failed to state a breach of

contract claim based on the mere fact that the permanent modification agreement increased her

monthly payments."  Young, 717 F.3d at 233.  In interpreting the TPP, the Court of Appeals read

the TPP as "draw[ing] a crystalline distinction between the trial period payment amount and the

monthly amount owed under the permanent modification[,]" stating that the TPP "expressly

allow[s]" for an alteration in the payment amount.  Id. at 232.  Because the TPP did not

guarantee a specific monthly payment, the difference between the TPP and permanent

modification payments is not a damage resulting from the alleged breach.

Finally, Plaintiff fails to submit admissible evidence of consequential or other damages

arising from the delay in offering a permanent modification.  During her deposition she was

asked:

Q:  What are your damages from February 1, 2010 to June 14, 2010 resulting from
[Defendants'] failure to send you a Permanent Loan Modification under HAMP?
. . .

A:  I think continued problems with my credit. I was having health problems. I was definitely suffering a lot, I had been for quite a few years, with your client . . . As far as out-of-pocket expenses, I had—I had paid Jerry some to help me out.

Doc. No. 91-5 at 198:18-199:7.  Elsewhere in her deposition testimony, she also argued that she suffered fear of loss of professional reputation.  Doc. No. 91-5 at 208:22-209:2.  Looking first to her alleged credit problems, Plaintiff states that the delay in receiving the permanent modification impaired her credit, however, she submits no documentation showing any impairment of or change to her credit during this period.  And, she identified no effect, as illustrated by the following exchange:

> Q. What was your credit score on February 1, 2010?
>
> A. I don't know.
>
> Q. What was your credit score on June 14, 2010?
>
> A. I don't know.
>
> Q. In essence, you really don't know how your credit was impacted by [Defendants'] purported breach of this TPP; correct?
>
> A. I don't know exactly how much, but I'm sure it was a factor.
>
> Q. But you can't point to anything to tell me because you didn't even know what you credit was before or after; correct?
>
> A. Off the top of my head, I do not know.

Doc. No. 91-5 at 201:12-25.

Turning next to her claims of mental or emotional distress, such claims are generally not cognizable in a breach of contract claim.  See John Hancock Mut. Life Ins. Co. v. Banerji, 858 N.E.2d 277, 288 (Mass. 2006) ("As to the contract claim for emotional distress, damages for mental suffering are generally not recoverable in an action for breach of contract.").  Plaintiff has not offered any argument that an exception to this rule applies.  Similarly, regarding the alleged

loss of professional reputation, she stated in her deposition, that "[n]obody else except the people who had been immediately helping [Plaintiff]" knew that she was awaiting permanent modification of her loan during this period. Doc. No. 91-5 at 209:7-25. Accordingly, what she alleges is not loss of professional reputation, but emotional distress arising from the fear of loss of professional reputation, a claim which fails with her other emotional distress claims.

As to her out of pocket expenses paying her representative, Jerry DeSalvatore, he testified that he was "[n]ever paid" for the services he provided to Plaintiff, stating: "No. This would be pro bono, because Sue does work for us and for me, and I could get David to take on the case if I did the work for free." Doc. No. 91-11 at 22:13-24. Notably, Plaintiff offered no documents in support of her claim that she paid for legal work nor any evidence that the payments reflected work during the period of February 1 to June 14, 2010, while she was awaiting a permanent modification.[2]

Finally, Plaintiff cannot argue that she suffered damage due to a change in her equity in her residence during this period as she admits she does not know whether her equity in her property changed between February 1, 2010 and June 14, 2010. Doc. No. 95-2 ¶ 99.

Thus, Defendant has established that the record contains an absence of evidence of damages.[3] Accordingly the Motion for Summary Judgment is ALLOWED as to Count I.

---

[2] The Court notes there are also allegations that Plaintiff paid another attorney, Dave Crowley, in regards to issues with her mortgage, but that occurred in 2008, well before the TPP or the offered modification. Further, Plaintiff's claim for attorneys' fees is tenuous because under Massachusetts law parties bear their own expenses except where "(1) a statute permits awards of costs, or (2) a valid contract or stipulation provides for costs, or (3) rules concerning damages permit recovery of costs." Fuss v. Fuss, 368 N.E.2d 271, 274 (Mass. 1977) (internal citations omitted). Plaintiff has made no argument or showing that one of the exceptions to that rule applies, nor explained how she can otherwise recover pre-suit legal fees. See City of Revere v. Boston/Logan Airport Assocs., LLC., 443 F. Supp. 2d 121, 127 (D. Mass. 2006) (granting summary judgment on "problematic" contract claim where damages were limited to attorney's fees and party seeking fees had not shown one of the "rare, clearly defined" exceptions to apply).

[3] The Court acknowledges that Massachusetts law recognizes nominal damages as a remedy for plaintiffs who cannot prove actual damages from breach of a contract. Flynn v. AK Peters, Ltd., 377 F.3d 13, 23 (1st Cir. 2004). Nonetheless, the Court need not decide whether nominal damages are sufficient to sustain the breach of contract

B.      **Chapter 93A Claim**

Defendants also move for summary judgment on Plaintiff's Chapter 93A claim.  Plaintiff

sues both the servicer of her mortgage, Homeward, and the trustee of the trust holding her

mortgage, Wells Fargo.  All of the allegations in support of her Chapter 93A claim concern

conduct by Homeward.  Plaintiff offers no evidence whatsoever of any conduct by Wells Fargo

nor any ratification or participation by Wells Fargo in Homeward's conduct.  In addition,

Plaintiff sent only one Chapter 93A demand letter.  She sent this letter to Homeward only and in

it described only Homeward's conduct.  For these reasons, Defendant Wells Fargo's Motion for

Summary Judgment on Count V is ALLOWED.  See Rodi v. S. New Eng. Sch. Of Law, 389

F.3d 5, 19 (1st Cir. 2004) (noting that a demand letter is "a prerequisite to suit" for a Chapter

93A claim and dismissing the claim on that basis) (quoting Entrialgo v. Twin City Dodge, Inc.,

333 N.E.2d 202, 204 (Mass. 1975)).

For its part, Homeward has also moved for summary judgment on the Chapter 93A claim,

arguing that its actions do not amount to the sort of unfair or deceptive acts that violate that

statute.

*Chapter 93A - Emotional Injuries*

As part of her 93A claim, Plaintiff seeks damages for emotional distress, asserting that

Homeward violated 93A by knowingly and willfully causing her emotional distress.  As the First

Circuit noted, recent cases from the Massachusetts Supreme Judicial Court "appear to have

returned to the notion that injury under chapter 93A means economic injury in the traditional

---

claim in this case, both because of the Court's resolution of the materiality issue above and because Plaintiff—
neither in her Complaint, nor in her motion papers, nor when asked by the Court at the hearing on this Motion to
enumerate her damages—has ever articulated that she is seeking nominal damages for the alleged breach in this
case.  See id. (affirming lower court's judgment as a matter of law on the basis of failure to prove actual damages in
a contract claim where plaintiff did not argue for nominal damages and argued instead that she had proven
damages).

sense." Young, 717 F.3d at 241 (citing Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 255 (1st Cir. 2010)). Although the Supreme Judicial Court has not overruled its past precedent that recognizes non-economic injury in some situations, see Rule, 607 F.3d at 253-55, Homeward correctly notes that Plaintiff must prove all the elements of intentional infliction of emotional distress ("IEED") in order to prevail on a 93A claim for emotional damages. Haddad v. Gonzalez, 576 N.E.2d 658, 666 (Mass. 1991).

IIED requires that the plaintiff show that the defendant "(1) intended to inflict emotional distress by (2) undertaking actions that were extreme and outrageous, thereby (3) causing emotional distress which (4) was severe." Young, 717 F.3d at 240. In affirming the dismissal of Plaintiff's separate IIED claim, the First Circuit found that she alleged "no facts showing that [Defendants] acted with the requisite intent or that the inconvenience and agitation Young endured rose to such a level that 'no reasonable [person] could be expected to endure it.'" Id. (quoting Limone v. U.S., 579 F.3d 79, 94 (1st Cir. 2009)).

On summary judgment, Plaintiff still shows no evidence to prove that Homeward had the requisite intent to cause her emotional distress. In the Plaintiff's deposition, she describes having marital problems stemming from the issues related to the loan, and discusses the physical and mental health problems she began to experience in August 2008, though she never sought treatment from a doctor. Doc. No. 95-2 at 12 ¶ 103. The problems included "insomnia, dizzy spells, anxiety attacks, . . . tension headaches, . . . sleep and digestive disorders." Id. Plaintiff also submitted pages from a journal she kept in 2008, but they do not describe any health problems aside from feeling "despondent." Id. at 13 ¶ 106. In her deposition, Plaintiff alleged that Homeward had a general policy to "basically liquidate properties," disregarding any harm that it would cause her and other homeowners. Id. at 14 ¶ 107. Although Plaintiff undoubtedly

experienced some emotional repercussions as a result of her dealings with Homeward, Plaintiff's

general statement in her testimony that Homeward intended to "liquidate properties" fails to

prove that Homeward knowingly and intentionally harmed Plaintiff specifically. Thus, Plaintiff

cannot support the claim of IIED as required for damages under 93A.

As such, Defendants' motion for summary judgment as to Plaintiff's claim for damages

for emotional distress under Chapter 93A is ALLOWED.

*Chapter 93A - Economic Injuries*

As to economic injuries under her Chapter 93A claim, the First Circuit found that

Plaintiff's complaint "sufficiently allege[d] that she experienced economic damages as a result of

defendants' conduct." Young, 717 F.3d at 241. On appeal on the motion to dismiss, Defendants

did not address whether their conduct was an unfair trade practice, but argued that Plaintiff did

not sufficiently plead that she suffered damages as a result of Defendants' alleged violations. Id.

at 240-41. The First Circuit found, however, that Plaintiff's claims of Defendants' "mistakes

during the forbearance and loan modification process" sufficiently alleged that Defendants

"subjected her to loss of equity in her home and damage to her credit ratings," which could have

"plausibly" placed Plaintiff in a worse position than she would have been if the Defendants acted

appropriately. Id. at 241. Now, on summary judgment, Homeward argues that it did not engage

in unfair or deceptive practices and Plaintiff has shown no evidence of damages resulting from

Homeward's conduct. Doc. No. 90 at 16-17, 29-31.

In determining whether a practice violates Chapter 93A, the Court must look to "(1)

whether the practice . . . is within at least the penumbra of some common-law, statutory, or other

established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or

unscrupulous; [and] (3) whether it causes substantial injury to consumers[.]" Mass. Eye & Ear

Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (citing PMP

Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)).  In addition to a

defendant's conduct and knowledge, a plaintiff's conduct, knowledge, and what she reasonably

should have known are factors to determine whether conduct is unfair.  Swanson v. Bankers Life

Co., 450 N.E.2d 577, 580 (Mass. 1983).  Although deceptiveness is less-clearly defined, some

cases have held that an act is deceptive "if it could reasonably be found to have caused a person

to act differently from the way he or she otherwise would have acted."  Incase Inc. v. Timex

Corp., 488 F.3d 46, 57 (1st Cir. 2007) (quoting Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d

476, 486 (Mass. 2004)).

Plaintiff relies on four instances where Homeward's actions constituted unfair or

deceptive practices.  First, Plaintiff claims that Homeward violated Chapter 93A by forcing her

into a forbearance agreement after she defaulted on her loan.  Specifically, Plaintiff asserts that

Homeward refused to cash a $2,500 check for her mortgage payment that she sent when she was

already in default on her loan obligations, placed the loan in foreclosure, and gave her no other

option to keep her home other than to enter into a forbearance agreement.

When Plaintiff received a notice that her mortgage was late on August 27, 2008, she

called Homeward and was told that the $2,500 payment was received but not processed because

her loan was in foreclosure.  Doc. No. 95-1 at 10 ¶ 15.  After several phone calls with

Homeward, she was told to send Homeward a check for $5,628.42[4] in order to receive a

forbearance agreement.  Id. at 11 ¶ 18.  On September 4, 2008, she sent the check to Homeward,

and on September 8, 2008, she called Homeward as she had not yet received the forbearance

agreement.  Id. ¶ 19.  Plaintiff testified that a Homeward representative told that if her $2,500

---

[4] Plaintiff testified the payment demand might have been for $5,000.00.  Doc. No. 91-4 55:3-16.

check had been processed, she would not have been placed into foreclosure. Id. at 11-12 ¶ 20. Young received the forbearance agreement by fax on September 10, 2008, id. at 12 ¶ 21, and had until September 23, 2008, to review, sign and return the agreement, id. at 15-16 ¶ 29. Young signed the agreement that day, September 10th. Id. at 14 ¶ 26.

Under the original Mortgage agreement, "[i]f any installment under the Note . . . is not paid when due, . . . all sums . . . and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice[.]" Doc. No. 95-1 at 2 ¶ 3. Regardless of the Homeward representative's statement to Plaintiff, it is undisputed that Plaintiff was two months in default when she sent Homeward the $2,500 check. Id. at 21 ¶ 44. Per the Mortgage agreement, Homeward had the authority to foreclose on her property at any time after she defaulted. The Mortgage agreement placed Plaintiff on notice that any late payment could place her home into foreclosure. Rather than continue the foreclosure process, Homeward offered Plaintiff a forbearance agreement as a way for her to keep her home. Homeward was under no obligation to offer Plaintiff a forbearance agreement, but did so after Plaintiff contacted them. These acts were not unfair or deceptive.

Plaintiff testified that she felt pressure to agree to the forbearance, id. at 15 ¶ 28, did not have an adequate opportunity to review its terms and consult a lawyer, id. at 14-15 ¶ 27, and disputes Homeward's assertion that Homeward verbally explained the agreement to her over the phone, id. at 15-16 ¶ 29 (Pl.'s Rep.). However, Plaintiff had from September 10, 2008, to September 23, 2008, to review, sign and return the agreement. Id. ¶ 29. Plaintiff chose to sign the agreement and sent it back to Homeward the day she received it. Id. at 14 ¶ 26. Thus,

Homeward's conduct was not unfair or deceptive when it foreclosed on Plaintiff's home and

offered her a forbearance as an alternative to foreclosure.[5]

Second, Plaintiff claims that Homeward violated Chapter 93A when it sent her the

January 13, 2010 HAMP denial letter which stated that she was ineligible for a HAMP

modification because she did not submit TPP payments on time. Doc. No. 95-1 at 34 ¶ 74. The

denial letter was triggered by the computer system, which flagged Plaintiff's payment as late.

Although the facts as to the communication between Plaintiff and Homeward following the

receipt of this letter are unclear, [6] it is undisputed that Plaintiff's paralegal, Jerry DeSalvatore,

called Homeward on February 17, 2010, and the Homeward representative with whom he spoke

told him that the denial letter was sent in error and that Plaintiff's loan was currently being

processed for a modification. Doc. No. 95-1 at 39 ¶ 77. The representative instructed

DeSalvatore that Plaintiff should make her February payment of $1,368.94, the same amount as

the other TPP payments, id., which she sent on February 22, 2010, Doc. No. 95-2 at 3 ¶ 83. In

Homeward's computer log, an employee noted that the letter was sent in error on February 17,

2010. On that date, DeSalvatore sent Homeward a letter confirming the conversation. Doc. No.

95-1 at 39 ¶ 78.

Although the Homeward representative informed Plaintiff that the denial letter was sent

in error, that she should send a payment in the amount of $1,368.94, and that she would receive a

---

[5] In Plaintiff's Opposition to Defendants' Motion for Summary Judgment, she points to the fact that the log entries in Homeward's computer system showed that Young's repayment plan was "deleted in error" and that the payments were actually applied. Doc. No. 95 at 17 (relying on Doc. No. 95-2 at 22 ¶ 7). As Homeward correctly notes, this does not have any bearing on the issue of whether she was forced into forbearance, and does not constitute an unfair or deceptive act because the employee reset the terms of the forbearance agreement.

[6] Plaintiff testified that she went to her bank immediately after receiving the check and discovered that one of the checks she mailed under the TPP had not been cashed. Doc. No. 91-4 148:18-24. She testified that DeSalvatore called Homeward thereafter and they told him that they had not received her November payment. Id. 148:18- 149:7. Plaintiff testified that she sent another check, although evidence of this check is not in the record. Id. 150:18-22. DeSalvatore testified that he called Homeward on February 16 and spoke with a different Homeward employee and received no answer to his question. Doc. No. 91-11 140:12-141:7.

loan modification, this conduct does not rise to the level of an unfair or deceptive practice. First,

an act of negligence alone does not constitute a violation of Chapter 93A. Klairmont v.

Gainsboro Rest., Inc., 987 N.E.2d 1247, 1257 (Mass. 2013). The Homeward employee's

representation to Plaintiff that the denial letter was sent in error represents an act of negligence

and does not in itself constitute a Chapter 93A violation. Second, the payment that Plaintiff sent

was in the amount that she claims would have been her monthly rate under the HAMP

modification. Thus, Homeward's mistake did not lead Plaintiff to act differently than she

otherwise would have. Third, Plaintiff has not provided any evidence to show that she did not

breach the TPP agreement. Plaintiff eventually did receive a loan modification, although it was

five months later and was not the HAMP modification that she anticipated. Thus, sending the

denial letter was not an unfair or deceptive act, nor was the statement made by the Homeward

employee regarding the letter.

Third, Plaintiff claims that Homeward violated Chapter 93A by sending her an ARM

Change Notification on February 14, 2010. Plaintiff testified that when she executed her

adjustable rate mortgage in 2006, she read and signed an adjustable rate rider. Doc. No. 95-1 at

2-3 ¶¶ 3-4. She testified that she understood that it was the "clause in the ARM Rider that

continues to go on" until a permanent loan modification was executed, but she believed "that the

Permanent Loan Modification was going to be coming along very soon." Doc. No. 95-2 at 2-3 ¶

82. She also testified that "it wasn't a surprise that the interest rate would change." Id. at 1 ¶ 81.

Plaintiff testified that she concluded the ARM Notification meant that Homeward had "reneged

on the trial modification contract and [was] reverting to an earlier situation." Id. (Pl.'s Rep.).

However, Plaintiff has not shown, and does not argue, that the ARM Change Notification was

sent in error and concedes that her interest rate could change under the terms of her original

Mortgage.  Nor does she show that the Notification caused her to act differently from the way she otherwise would have acted.  Homeward had the authority to change the interest rate under the signed agreement as long as the original Mortgage was still being executed, which it was. Thus, sending Plaintiff the ARM Change Notification does not constitute a Chapter 93A violation.

Finally, Plaintiff claims that Homeward violated the HAMP guidelines by sending her a traditional loan modification and by sending the modification in June rather than February, which she claims is a violation of 93A.  On March 8 and 9, 2010, DeSalvatore testified, and his notes reflect, that he attempted to contact Homeward and could not get through to anyone.  Doc. No. 91-11 at 170-71.  On March 10, 2010, DeSalvatore spoke to two Homeward employees who told him that the permanent modification agreement was being negotiated by a third party and was taking "longer than it should."  Doc. No. 95-2 at 4 ¶ 86.  On or about June 14, 2010, Homeward sent Young a traditional loan modification offer.  Id. at 4-5 ¶¶ 87-88.

Kearse testified that after the HAMP modification was denied due to Plaintiff's untimely payments, the loan "was reviewed for in-house or traditional modification."  Id. at 5-6 ¶ 89.  The modification offer required monthly payments of principal and interest calculated at a fixed rate of 4.625% for three years, with a 1% interest rate increase beginning on June 1, 2013, for each year until it reaches the maximum rate of 5% for the remainder of the loan.  Id. at 6-7 ¶ 90.  The modification required an initial down payment of $1,974.43 due on or before June 25, 2010, and regular monthly payments of $1,658.71.  Id. at 7 ¶ 91.  Plaintiff testified that she considered the terms to be "a significant departure" from the "original agreement" (the TPP) and that the loan modification was "punitive" because it arrived months later than the February 1, 2010 date, by

which Plaintiff believes Homeward was bound to provide her with a HAMP modification.  Id. ¶ 92.

In order to make out a 93A violation based on alleged HAMP guideline violations, a "plaintiff must plead (and later prove) not only that the HAMP guidelines were violated but also that [the defendant's] actions were unfair or deceptive."  See Kozaryn v. Ocwen Loan Servicing, LLC, 784 F. Supp. 2d 100, 103 (D. Mass 2011).  Although Plaintiff did not plead that Homeward violated any specific HAMP guideline in her complaint, she furthermore has not set forth any evidence that Homeward violated the HAMP guidelines.  She also has not shown evidence to counter Kearse's testimony that Homeward followed the guidelines by denying her HAMP modification due to her untimely payments, a policy of which Plaintiff was on notice pursuant to the TPP agreement she signed.

Insofar as Plaintiff claims that Homeward's delay in sending the loan modification and the misleading communications from Homeward were unfair or deceptive acts, Homeward was under no obligation to send Plaintiff a loan modification at all, as evidence shows she violated the TPP agreement.  Instead of placing Plaintiff's mortgage in foreclosure, Homeward conducted third-party negotiations in order to offer Plaintiff a different type of loan modification.  Although one employee from Homeward led Plaintiff to believe that her HAMP modification was not denied, this does not constitute an unfair or deceptive act. The March 10, 2010 conversation between DeSalvatore and two Homeward employees correctly informed him that the loan was being negotiated and indicated that it would take some time.  Additionally, these conversations should have placed the Plaintiff on notice that she would likely not receive a loan modification that was under the same terms as the TPP, whether it was a HAMP modification or a traditional loan modification, since "negotiations" were occurring.  Sending a traditional loan modification

a few months later, after Homeward spent time to conduct third-party negotiations, was reasonable and did not constitute an unfair or deceptive act.

Even when all four instances are viewed together, Homeward's behavior does not rise to the level of a 93A violation. Plaintiff, who was in default on her loan and placed in foreclosure proceedings, who defaulted again after entering into a forbearance agreement, and failed to make timely payments under the TPP, albeit only one day later, received a traditional loan modification, which she did not accept. Although a Homeward employee erred in informing Plaintiff of the status of her loan and was difficult to communicate with, these acts are neither unfair nor deceptive in light of the Plaintiff's actions and the totality of the circumstances. To the extent that Plaintiff asserts that Homeward's entire business structure represents unfair and deceptive practices generally due to its large number of employees (300 to 3,000), its computer log system and practice, and its use of computer programs to send notifications such as the January 13, 2010 denial letter, Doc. No. 95 at 15, Plaintiff has shown insufficient specific evidence as to how Homeward's commonly used practices by many large businesses was unfair or deceptive to Plaintiff or caused her damages.

For the foregoing reasons, Defendant Homeward's motion for summary judgment as to Plaintiff's claim for economic damages under Chapter 93A is ALLOWED.

C.      **Equitable Relief**

Plaintiffs' claim for equitable relief is entirely derivative of her claims for breach of contract and violation of Chapter 93A. Young, 717 F.3d at 242. As those primary claims have not survived summary judgment, the claim for equitable relief must be dismissed as well. Accordingly, Defendants' Motion for Summary Judgment is ALLOWED as to Count VI.

19

IV.     CONCLUSION

For the reasons set forth above, the Court ALLOWS Defendants' Motion for Summary

Judgment (Doc. No. 89) as to all remaining claims in Plaintiffs' Complaint.  In addition,

Defendants' Motion to Strike Plaintiff's Additional Statement of Facts (Doc. No. 103) is

DENIED as MOOT.

Accordingly, the Court will enter judgment in Defendants' favor, and the Clerk will close

the case.


                              SO ORDERED.

                              /s/ Leo T. Sorokin
                              Leo T. Sorokin
                              United States District Judge